Good morning, your honors and please the court. I'm Mark Gunnison and I'm arguing for the appellants. This case involves a de novo review of two decisions that the secretary of the Department of Interior made in May of 2020. The first decision, the trust determination, was that the department was required under the provisions of PL 602 to accept land and trust in Park City, Kansas on behalf of the Wyandotte Nation. The second determination, the gaming determination, was that once the land was in trust, the secretary determined in the one paragraph she devoted to this part of the decision, that the land met the settlement of a land claim exception under IGRA. Our position is both those decisions were arbitrary and capricious and contrary to law because the secretary failed to consider significant and important aspects of the issue and provide a reasoning that was contrary to the evidence before the policy. With regard to the trust determination, there's four reasons why it should be set aside. Underpinning that trust determination is this court's decision in 2001 where the court determined in the Shrinertrack case decided at that time that in order to invoke the mandatory trust acquisition provision of PL 602, the land in question has to have been purchased with only the funds that were set aside by that statute for the purchase of land. Now with that in mind, the first reason the trust determination should be set aside is because the very financial records that were submitted for the first time to the secretary in 2017 contained an unequivocal accounting admission that the Park City land was not purchased with any of the 602 set-aside funds. Are you talking about the over audit? Yeah, I'm talking about the over audits and the over audits were the audits of the Wyandotte's financial statements that were created upon the receipt of the 602 funds in 1986, including the $100,000 set-aside funds for the next 10 years. They tracked the Wyandotte's financial statements and those financial statements tracked not only the investment of the 602 funds, but also the earnings and the interest that was generated from those funds and what was done with the earnings and interest in those funds. And the accounting entry, while I'm on it, was done in August of 1993. And in that accounting entry, the Wyandotte stated through their financial statements and the over audits that the money that was raised to purchase the Park City property in November of 92, done through a margin loan, is transferred out of what they referred to as a claims money fund, which is a PL 602 fund. It was transferred out of the fund. And thereafter, in 93, 94, 95, and 96, it's never listed as an asset of the claims money fund, of the 602 funds. Now compare that to the exact same purchase in July of 96 of the Shriner tract, also with a margin loan. The $180,000 raised at that time is identified in the over audits as part of the invested 602 funds. And it is then listed as a fixed asset in the September 1996 over audit of the claims money fund. Now, you might ask, why did they do that? Because the Park City land was applied to be put in trust in January of 93, way back then, and a month later, Sharon Blackwell came out and she issued a legal decision on behalf of the department that said that land's not going to qualify for gaming under any of the exceptions. So when it came time to account for the acquisition of that piece of property, the Wyandotte made sure to show that it wasn't purchased with any of the 602 funds, because they didn't want to have a piece of land with 25,000 of their $100,000 set-aside funds devoted to a purchase that they couldn't game on. But you know, it's just not me. The Wyandotte told the district court in 1999, and they came and told this court in 2000, in an effort to persuade you to uphold the Schreiner tract transaction, that the funds used to purchase the Park City land should not be characterized as 602 funds. The secretary never considered this, that alone is not, in records that she determined were fair and reasonable and that she relied upon. Can I ask you a question? You know, on this accounting issue, whether it's arbitrary or capricious, the OSM addressed exactly this argument that you made, rejected it. We're judges. We're not, at least I'm not a CPA. How can we say that OSM's determination, rejecting the argument that you squarely are making, OSM squarely rejected it. How can we say that's arbitrary and capricious? OSM never addressed that argument. OSM simply generally looked at the RSM and the financial analysis from the third party that came in, which I'll talk about in a moment, but OSM did not address this accounting issue. OSM didn't look at that. And there was no comment whatsoever. OSM didn't look at the financial accounting records that were deemed to be the foundational basis for the secretary's decision and say, geez, we didn't use this money to buy the park city land. It was never addressed. That is arbitrary and capricious to ignore such a significant aspect of the issue. The second reason that the trust determination should be set aside has to do with the financial analysis that the secretary relied upon, and that is this RSM analysis that was brought in to purportedly analyze what the OBRA audits provided or what they indicated. But that analysis contained a fundamentally flawed assumption that drove their numbers, that makes the numbers incorrect and misleading. And once again, OSM never addressed this. They accepted this assumption hook, line, and sinker with no comment. And the assumption was this. RSM said the secretary and the courts have determined that the wind out intended and the only use to be made of the interest in earnings on those set aside funds was to purchase a trust land. And therefore, they ignored all other uses made of that money. Well, but that's not even true. That fundamental assumption is not true. Back in April of 1996, Tom Hartman, the financial analyst with OSM back then in the Shriner track proceedings, told his boss, George Skabeen, he said, hey, the Wyandotte can spend the interest in earnings however they wish. Only the $100,000 must be spent on trust land. And the Wyandotte came and told this court the same thing. And they told the district court the same thing. So let me give you an illustration of the effect of the application of this assumption. In August 31 of 1992, we have a year-ending OBRA audit. On that same day, the department in its brief adopts the number that RSM says. On August 31, 1992, it says there's $173,000 in qualifying funds, funds with which trust land can be purchased. If you go to the OBRA audits on that exact same day, these are the Wyandotte's financial records that they submitted. You know what it says? There's the $100,000 set-aside funds and a total of $7,000 in cash from all sources. That's the interest in the earnings. That's everything. They spent the money. So it's a $66,000 difference on August 31 of 1992. Now, what can they buy with that $66,000? They've already spent the money. And unless you're going to give this interest in earnings the magic formula that it can be spent and then spent again and again, and on each of those occasions, it mandates a trust acquisition, that can't be done. And PL-602 doesn't provide for that. The secretary never said that. All the secretary said in the Schreiner proceedings is the accumulated interest in earnings can be added to the $100,000, and you can buy land, and that still meets this test. But in the Schreiner track proceedings, the secretary was led to believe that the interest in earnings had accumulated over time. And we couldn't prove otherwise because the records then were not the over-audits. They don't get produced until 2017. The records then were these investment account statements. And two years were missing. The number of years we just had one page, you couldn't tell what happened to the money when it was flushed out of the investment accounts. So the secretary gave the Wyandotte the benefit of the doubt, they assumed the money was there, and it was part of the interest in earnings in the 602 $100,000 set-aside funds. It passed the test. But the over-audits are a game changer. Now we know exactly what was done with the money, and it was gone. The secretary and OSM never addressed the validity of that underlying assumption. And that's what allowed RSM to generate the numbers that the Wyandotte needed to prove that they supposedly had money to make both purchase transactions. The third reason the trustee termination should be set aside has to do with the margin loan. Now there's nothing wrong with using a margin loan to raise money to purchase land. But you still have to satisfy this court's test from 2001. Now it was satisfied in the Schreiner track litigation because Tom Hartman, once again, the financial analyst with OSM, he said, well, the Wyandottes have used all the $100,000 invested as a collateral for that $180,000 loan. And then they've told us they have this $80,000 of interest in earnings remaining so that you don't have to liquidate the bonds. So long as you're using them as a collateral, it's the same as spending them. So fair enough. That meets the test. Okay. Fair enough. But that reasoning has to apply to the margin loan taken out in November of 92. Now again, unless you're going to allow them to spend the money more than once, then the $100,000 that were invested and that served as a collateral in July of 96 cannot be the margin loan. And we know that margin loan has to be collateralized or it can't be made. The OBRA audits tell us that in September of 96. RSM told OSM that. That means the collateral had to have been assets purchased with something other than the set-aside funds. You're saying that you can't use the same funds as collateral. You can't use this because in July of 96, the $100,000 was deemed a collateral for that margin loan. And that was the equivalent of actually spending the money on that property. So it's gone. So in November of 92, it's not available to be used because it's being held back and used four years later. So what was a collateral for the November 1992 margin loan? It had to have been something other than the $100,000 set-aside funds. It fails this court's test. The fourth reason the trust determination should be set aside has to do with the fact that the trust failed to acknowledge awareness of the department's own policy from the Shriner-Track litigation and provided no reasons for changing. And that policy was this. And by the way, that policy was not simply the musings of a couple of departmental employees sitting around the water cooler Monday morning. That policy was announced by the assistant secretary, Ada Deer, who made the decision to take the Shriner-Track and trust it. And on the same day she made that decision, she wrote to the department and she wrote to the Wyandotte and she said, hey, y'all, understand, you're using all the $100,000 set-aside funds, plus this additional interest and earnings, you say, has accumulated. And once we, to buy the Shriner-Track, and once we accept that and trust, understand, that fulfills the shell of the law. That fulfills our duty to take land into trust under 602. And she specifically said no further trust acquisitions may be predicated on that statute. And that came from Tom Hartman to George Skabeen, George Skabeen to Ada Deer, and Ada Deer made that explicitly clear. The secretary never addresses their own policy or precedent in that regard. And that alone is arbitrary and capricious. I just have a little time and I'd like to talk about the gaming determination. The primary reason the gaming determination should be set aside is the secretary, in the one paragraph that she discusses this issue, never even mentions her own regulations adopted in 2008 that set forth the criteria to be applied when determining whether this particular exception applies to newly acquired trust land. And there's no question if you apply that criteria, and it's in our addendum, it's 25 CFR 292.5. If you apply it, it clearly requires a different result. The secretary and the government suggest that it was OK to ignore it. May I continue to finish this point? You can finish this one thought. Thank you. And then wrap it up. To ignore, the secretary simply says, my decision is consistent with what Judge Robinson did in the 2006 NIGC case. And the department says, well, that seems reasonable. But as we argue in our brief, the analytical approach where you have a prior judicial decision, subsequent agency interpretation, here through regulation of a statute, when they're at odds, you've got to determine, did the district court conclude that the statute in all its terms was unambiguous? Judge Robinson did not. In that 2006... You need to wrap it up. OK. She didn't do that. She only concluded that the one of the statute, one must be taken into trust. It's the land claim must be resolved. She never addressed the how. How must the land be taken into trust as part of a settlement of a land claim? You're way over time. Thank you very much. Thank you. Let's see if you give the appellee an extra minute. Good morning, Your Honors. May it please the court to memorandum for the United States. I'd like to begin with the appellant's exclusive focus on the $100,000 in principle that was allocated to the tribe in the public law 602. Appellant's trust acquisition arguments on this point require that this court adopt the notion that the original $100,000 in principle that was allocated to the tribe is the only amount of money that Interior could consider when determining whether it could take the Park City parcel into trust for the tribe. Well, is that really true in light of his argument about the OBRA audit? No, his argument, as I understand it, is that $100,000 was taken out of that out of that fund and it was never put back into that fund. And that does seem to be an omission in the RSM report. What's wrong with his argument? No, as I understood the argument from the briefing, as opposed to what was argued right here, but the understanding was initially for the Park City purchase in 1992, there was an initial assumption, this has already been taken care of, RFM did address it, as Your Honor said, but there was initial belief that a little over $25,000 was taken out of the account for the Park City parcel purchase. But ultimately, that money was put back into the tribe's account because there were title issues with the purchase of that property. Later in 1992, the money was taken out again, $25,000, and the purchase of Park City was made. There was no, I don't know, and there wasn't any citation to the record where the entire $100,000 was removed and never replaced. So getting back to the point, though, we have an allocation of $100,000 that was given to the tribe by Congress. It's the tribe's money. The argument that the appellants must have you accept is that the $100,000 was all that could be considered. But we know that's not the case. We know that's not the case because in 2006, at the end of the Schreiner Track litigation, the court and governor of Kansas v. Norton established that when Interior makes a trust acquisition determination, it looks not only at the principle, it looks at the principle and all of the interest that had been generated by that principle. Why do we care what the district court in Norton said? It's not presidential. It's not law of the case. No, I will. With respect, this is with respect to the trust acquisition. This isn't the gaming eligibility question of whether. Oh, I understand that. OK, no, what I'm saying that was based on that district court decision and that ruling was never overturned. That's the only reason that Interior was able to take the Schreiner Track into acquisition because of the determination reached in that district court decision. That ruling, that Interior is to look at both principle and earnings, wasn't challenged. And indeed, it's the only reason Schreiner Track was actually taken into into trust. Now, we know Schreiner Track costs $180,000. That's more than $100,000. So we know that Interior can look beyond just the $100,000 to see what's the total amount of qualifying funds. And they're determined if there is enough for the purchase of the properties at issue. The point I also want to make is to make sure the court understands that whatever happened after that, Your Honor, you have something you want to say. Would you like to? OK, it looks like you were. Well, I did want to interrupt you again, but I did want to ask you, can the tribe use the same funds as collateral in the margin loan account? Can it use those same pool of funds as collateral more than once? That gets to the question that the argument appellants are making is that there was a certain amount of collateralized bonds that were associated with the $100,000 in principle. And again, they need you to believe that there wasn't there was only $100,000 to spend. And after the Schreiner Track was purchased, there was no more money. So they're saying not only it wasn't their principle, but there were no bonds to be collateralized as part of principle. So this is all part of the same argument that is trying to focus solely on the $100,000. But it's also important that this court understand that the question of the purchase is not the question that we need to be asking for purposes of whether Park City could be acquired. And that's because Schreiner was purchased and taken into acquisition in 1996. So the question of the amount of money that remained didn't matter for Park City because Park City had been purchased in 1992, four years earlier. So the question is, and it's the question that Interior and OFM looked at, the question is, what was the amount of money available in principle and interest in 1992 for purposes of Park City? It's a separate question. What was available in 1996 for the purchase and acquisition of the Schreiner Track? So I just wanted to start with those two fundamental points that it's not just $100,000 and it's not looking at what was left after the Schreiner Track litigation. If your honors don't mind, I'd like to turn to the issue of the alleged department policy. It's appellant's argument that while Interior was determining whether it could take the Schreiner Track into acquisition or whether it could acquire the Schreiner Track for the tribe, that the agency allegedly put in place a policy that prohibited the agency from acquiring Park City or acquiring Park City interest for the tribe. Now, appellants have crafted this argument from a few select statements made by individuals at the Department of the Interior. The essence of those statements was that, and this is about the Schreiner Track litigation, if the tribe used $100,000 to purchase Schreiner, it hadn't been purchased at the time. If they used $100,000, then no future purchases could be made because at the time Interior believed it was only $100,000. So Interior was saying there could be no future purchases and thus we, as the agency, can't make an acquisition. But the court has to remember that as a threshold matter, these statements were made in a particular context and a limited context. And for that reason, they can't reach the Park City parcel and I'll explain why. The circumscribed nature of these statements and the context of these statements is made clear by the fact that, one, the statements were made during Interior's assessment of only the Schreiner Track. Nothing about Park City was before it at the time. It was looking only at the Schreiner Track. Number two, the statements were made at the early stages of Interior's interpretation of the trust acquisition provisions in Public Law 602. It was these individuals' belief that the tribe had only $100,000 to spend. The agency was under the belief that the tribe was going to buy Schreiner Track and so the agency thought there's only $100,000, none will be left. But these statements didn't have the benefit of the subsequent 2006 decision that I spoke of in Governor of Kansas v. Norton, which said you look not only at the $100,000. Those statements the agency made back then didn't have the benefit of the forensic accounting that accounted for the principal plus the earnings. Well, there would be a good argument that a department of policy, that there are reasonable grounds for deviating from a department policy, but none of that was articulated. It did seem that the court or that the agency disregarded the department policy because the department policy was enunciated in language that would prohibit any other acquisition into the trust, not any additional purchases of property. Well, Your Honor, a few points. First, the agency cannot acquire land that hasn't been purchased. The point being acquisition is inextricably linked to a purchase. So these statements that refer to future acquisitions necessarily mean future acquisitions that are attended with a future purchase. And the reason I can say that with confidence is because if Interior meant to say we can't acquire something in the future, whether it was purchased in the future or purchased in the past, the only piece of property that existed in this record that was purchased in the past, but perhaps there could be a future acquisition, was Park City. If Interior wanted to put in place a policy that limited or actually prohibited it from purchasing Park City, it is reasonable to assume that Interior would come right out and said, oh, and by the way, we cannot acquire Park City. That was not said. What Interior speaks to is only its role, which is acquisition. It was only speaking to the fact that it believed there would be no future money, therefore no future purchases, therefore no future acquisition. And the reason we also know that this was not a policy put in place by Interior is because the policy that appellants speak of is preemptive in nature. It says in essence that at the time of the Schreiner litigation, which was in around 96 plus 10 years, that Interior was somehow making a statement about Park City and saying, we can't acquire it. But Interior had not sat down with the figures of the principal and interest. It did not know the funding circumstances of Park City, so how could it make a policy about whether it could acquire Park City? And we know that it wouldn't do that because Public Law 602 says that if land has been acquired with qualified funds, being principal and earnings, the Department of the Interior must acquire the land. And this court issued in its decision Sack and Fox Nation versus Norton, it's this court held that Interior had no discretion to refuse to acquire land that had been purchased with qualified funds. So even if there were such a policy, it could have no effect because it runs contrary to the very objective and mandate of Public Law 602, which requires acquisition if lands were purchased with qualified funds. And Interior could not make that decision until the tribe came to Interior and said, we would like you to acquire Park City, please look at our documents, please look at the figures, and then reach a determination as to whether qualified funds were used, because if Interior made that decision, it had to acquire the lands in trust, and that's what it did here. I'd like to turn briefly to the extra record evidence that's based on the report of Mr. Gottlieb. That evidence is, and it's the evidence, it's the challenge to the RSM report. That evidence was not part of the administrative record. It is not part of the record below in this case, and the district court struck it. So I would like the court to bear in mind as it considers these arguments, they're based on extra record material. Appellant's argument generally is that the OBERT audit included an entry about a particular investment, which is the Verus investment. They didn't argue this here this morning, but the essence of their argument is that the OBERT audit included information that they believe the RSM report should include. What this court should bear in mind as to the issues on that aspect of the accounting is that the OBERT audits were indeed audits, and the RSM report was a very different document that had a very different objective. Now, the OBERT audits explain what their objective was at volume seven of the excerpts of record, pages two, eight, and 17. They state that the audits were conducted to determine if the financial statements reviewed by the firm fairly presented both the financial position of the tribe's entire public law 602 funds and the result of that fund's operation. They were looking at the results of that fund's operation for the particular years analyzed. This is just a general assessment of all of the funds. There's no objective as to whether a piece of property can be purchased. It's an audit simply of the financial statements. Now, in contrast, the RSM report, as established in the record at volume 14, page 41, the RSM report was conducted for a much more discreet purpose, and that was to trace the $100,000 that was initially given to the tribe and to determine what the earnings were on that money. Why didn't the loss on the Verris investment impact the amount of money that was available for the Park City? If your honors look at the record, the Verris investment, what appellants are saying is in the OBERT audits, there were two entries for Verris. One showed that it was an asset in a certain amount. The next showed that it was a loss. The tribes had that investment for only about a year. It's appellant's position that that needs to be in the RSM report. Well, even if it is in the RSM report, because this isn't an audit, this is tracing only the $100,000 and the interest earned or spent on it. The entry of one amount of money and then a second entry showing a loss of that same amount of money is a zero sum in terms of just looking at the $100,000 and how that money grew or was reduced by interest earned on it. So the Verris investment, again, I can see, we can all see why it's in an audit. It was activity and the audit looks at activity. But the RSM report was tracing the growth of the $100,000 that was given to the tribe, unless the court has any other specific questions. We ask that the court affirm. Will, I did want to ask you on the 2008 regulations, there was no discussion by the court about the 2008 regulations. Isn't that an error? No, and there was no, this is quite lengthy and I hope the court will allow it. Well, I'm trying to keep it brief. There is no prohibition on the interior relying on a decision that reached the very issue that was before it. The issue before it at the time was whether Park City was eligible for gaming. And the Wyandotte Nation District Court decision looked at EGRA and the exception and looked at Public Law 602 and determined it analyzed the interconnection, if you will, or the confluence of those two statutes and found that the exception applied to Public Law 602. To be quite frank, the reason we are discussing the regulations is that the appellants want this court to focus solely on the regulations. And it's because they don't agree with the Wyandotte Nation decision and they can't challenge that decision at this point. So what they've done is teed up an issue before this court and said that, well, we have a conflict between statutory interpretation and Wyandotte Nation versus the regulations. Appellants haven't defined what the statutory interpretation conflict is. What they've done is devoted many pages of their brief to what they believe the court buys that, then the court would reach a decision that's different than Wyandotte Nation. And that's what the appellants want to have happen. So Interior had a decision already that looked at a legal matter. What is the intersection of Public Law 602 and EGRA's exception? Does it apply? And that court looks specifically at Public Law 602 as a general matter and said that for all land that's purchased pursuant to Public Law 602 and then acquired, we find that that is eligible for gaming. So that court then looked at Shriner Track and said Shriner Track was acquired according to Public Law 602. We found that Public Law 602 qualifies for the exception. So Interior said, we've got the legal issue completely decided. Park City is exactly situated as Shriner Track was. It was acquired under Public Law 602 and it applied that. Thank you. Thank you, Your Honor. Because, you know, it was my fault, but because the ability went over time, I'm going to give you, you know what, that was my fault, not yours. But you went over this well, but that's fine. That was my mea culpa, but I'm going to give you one minute, but do keep it one minute. Thank you. Very quickly in the gaming issue, the analytical approach is brand X. Did the district court conclude that the statutory exception language was unambiguous? If so, it forecloses agency interpretation. All that Judge Robinson addressed was the what of the statute. The land must be acquired in settlement of the part of what? A land claim. She did not address the how language of the statute. How must the land be acquired in trust as part of a settlement of a land claim? The land claims were resolved by judgments that were paid, appropriated. They were extinguished before PL 602 came into play. The agency's regulations and criteria are inconsistent with Judge Robinson's decision. And yes, we may disagree with that decision. This court hasn't had a chance to rule on her decision, but we don't have to address that. It is in conflict with the agency regulation and there is room for the agency to apply its criteria. We are not just focused on the $100,000. My time is up and I thank you so much for your attention. All right. Thank you both. The arguments today and in your briefs I thought were really excellent and very helpful.